## J. I. CASE THRESHING MACH. CO. v. STREET et al. (No. 8179.)

(Court of Civil Appeals of Texas. Dallas. June 28, 1919. Rehearing Denied Dec: 6, 1919.)

1. BILLS AND NOTES ⬅➡64—NOTES AND MORT-GAGES DELIVERED ON CONDITION.

Where notes and mortgage for purchase price of engine were delivered by defendant buyer on condition that they should not be effective until plaintiff seller demonstrated engine to defendant's satisfaction, and defendant accepted it in writing, *held* that notes and mortgage never became effective, where defendant did not accept the engine, but notified plaintiff that he would not do so.

2. SALES ⬅➡128—RESCISSION BY RETURN OF MACHINERY BOUGHT.

In suit on notes given for price of engine and separator, and to foreclose mortgages securing the notes, *held* that return of engine and its acceptance by plaintiff seller constituted a rescission.

3. CONTRACTS ⬅➡274 — WHAT CONSTITUTES "RESCISSION."

To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning, and rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Rescission.]

Error from District Court, Dallas County; W. F. Whitehurst, Judge.

Suit by the J. I. Case Threshing Machine Company against W. G. Street and another. Judgment for defendants, and plaintiff brings error. Affirmed.

See, also, 188 S. W. 725.

Spence, Havin & Smithdeal, of Dallas, for plaintiff in error.

Cockrell, Gray, McBride & O'Donnell, of Dallas, and Reeder & Reeder and J. B. Dooley, all of Amarillo, for defendants in error.

RAINEY, C. J. Appellant brought this suit against appellees Street and Creamer to recover against Street as maker and Creamer as guarantor upon two sets of notes, one set dated January 30, 1913, and the second set dated July 1, 1913, and to foreclose a mortgage given by Street and wife covering one 40 horse power gas tractor engine to secure the first set of notes, and to foreclose

another mortgage given to secure both sets of notes covering the same engine and a separator and appurtenances.

Defendant answered by demurrer and general denial, and specially that—

"Plaintiff in error represented to Street that the engine was a full 40 horse power engine, and would develop 40 horse power on the belt and 20 horse power on the drawbar, and would pull plows enough to cut a strip of land as wide as the engine—about 8 feet—plowing the ground 10 inches deep, at an average speed of 2½ miles per hour, and that the company proposed to take the engine out to D. M. Creamer's farm near Amarillo, and there demonstrate its said representations as to the capacity of the engine if Street would thus sign the written order for the engine and the notes and chattel mortgage first above described, and also procure Creamer to sign a contract guaranteeing their payment, and deliver the papers to the company, but to become effective and binding only in the event and on condition that the company would demonstrate that the engine had the power and would do the work that the company represented it had and would do. That Street accepted this proposition, and signed the order for the engine and the notes and chattel mortgage, and procured Creamer's signature to the guaranty contract, but left all of these documents with plaintiff company upon the express agreement aforesaid, and that the delivery thereof was conditioned and would not be binding upon either defendant until plaintiff in error by actual use and operation of engine in the field demonstrated the power and capacity of the engine to be in accordance with its representations. That upon the first demonstration at. Creamer's farm the engine did not develop the power and capacity as had been represented, but that plaintiff in error requested Street to continue the use of the engine, and that it would repair and adjust the engine and make it do the work as represented, and requested Street then to sign a written acceptance of the engine, which he then refused to do and did not do; but that, relying upon the promises and statements of the company as being true and made in good faith, he (Street) later in the spring of 1913 undertook to use the engine for the purpose of plowing, and found that it did not develop the 40 horse power, and did not have power to pull plows as represented by the company, of which he then notified the company, which sent its experts to test the engine, who stated that the failure of the engine to develop the rated horse power was on account of defective oiling process, which the company would promptly correct, and would either make the engine develop the horse power and do the work as represented or would furnish Street with another engine which would do so, and requested him to retain and continue to use the engine with the plows, and Street agreed to this proposition; but that the company, through its experts, could not and did not make the engine develop the rated horse power and do the work as the company had guaranteed it would do, and that Street then demanded the company to take the engine and furnish him with a new one, but that the company requested that the engine remain at Creamer's farm, and stated that it would yet discover the defects in the engine and get it in shape to develop the rated horse power, and that Street stated that he would not care to be bothered further with the engine. That the company then represented that it would put in new bearings and rings in the engine and leave same on Creamer's farm, and requested Street to try the engine once more when he had time and inclination so to do. That the company did put in the bearings and rings and made other repairs, leaving the engine on Creamer's farm, where it stood until November 1, 1913, at which time Street made known to the company that he had some ensilage to put up, and could test the engine in that work, and the company requested him so to do. That upon this test being made the engine failed to develop sufficient power to run the ensilage cutter, whereupon the company sent its experts to the engine, who worked on it and requested Street to continue to use the engine and make further report to the company, which Street agreed to do, but with like results, which he reported to the company, and at its request removed the engine back to Creamer's farm, where the company requested that the engine remain, and that the company would put the engine in good repair by the next spring, and wished Street again to test the engine in pulling plows in both sod and cultivated land. That Street notified the company that he did not care to be bothered with the engine unless he could have the company's assurance that it would furnish him a new engine in the spring, having power to pull the plows as had been represented, and if he had such assurance that he could get contracts for plowing, and that the company advised Street that if he would get such contracts that the company would furnish a new engine to pull the plows if it failed to make the engine in question develop the power it had represented. That Street assented to this proposition, and, relying thereon, did make contracts for plowing in the spring of 1914, and in the spring the company, having done considerable repair work on the engine, assured Street that same was in good condition and would develop the horse power as represented, and requested him to go forward with the engine in carrying out his plowing contracts, which Street undertook to do, but found that the engine still did not have the power as represented by the company enough to pull the plows, and thereupon demanded that the company furnish him with another engine that would do so, but that the company neither made the engine in question develop the necessary horse power, nor furnished him with a new engine, but requested him to keep it, assuring him that it would continue working on the engine until it developed the full represented horse power, which Street did at a great cost of time, labor, and consumption of oil, gasoline, etc., and in May or June of 1914 he notified the company that he would make no further effort to test the engine, whereupon the company proposed to him to furnish him a Case separator with attachments if he (Street) would procure threshing contracts and use the engine in that work, but that he stated to the company that he would not accept the engine for any purpose. The company stated that it would guarantee that the engine would pull and operate the threshing machine to its capacity, and that it would furnish to him a Case Company separa-

tor and guarantee to make the engine operate it to its capacity or furnish Street with a new engine that would do so if he (Street) would go forward and procure threshing contracts and use the outfit, whereupon Street advised the company that he would not accept the engine and become obligated to pay the notes that he had left with the company until he knew by test made by himself that the engine would operate the threshing machine to its capacity. That the company, then proposed to furnish him with a separator under a similar agreement that had been made as to the engine if he would sign the notes—which he did sign therefor—and also sign a written order for the separator and a chattel mortgage thereon securing the notes, and procure Creamer to sign another guaranty of the notes, and leave same with the company on condition that same were not to become binding unless the company was successful in making the engine operate the separator to its full capacity, or, in the event of its failure so to do, it would deliver to Street a new engine that would so operate the threshing machine, and upon this condition the order, notes, chattel mortgage and guaranty were signed and left with the company, and accordingly Street received the threshing rig and began to use it, whereupon the engine again failed to develop power enough to pull the machine to its full capacity, and this was made known to the company, which sent experts, who overhauled the engine, and requested Street again to try it in operating the threshing machine, which he did, but same failed to develop sufficient power to pull the machine to more than half its capacity, when Street made these facts known to the company, and also made known his threshing contracts, and requested the company to furnish him a new engine as it had contracted to do, which the company failed and refused to do, stating its intention to again overhaul and adjust the engine, assuring Street that it would certainly be able to make it develop the rated power, and requested him to continue the use of the engine pending further adjustments, which he did, and proceeded with his threshing contracts as best he could with the defective engine until the month of January, 1915, during which time the engine never developed sufficient power to operate the machine, although the company's experts frequently worked on it, and that on or about the 10th of January, 1915, the company discontinued all efforts to make the engine work, and refused to furnish Street with a new engine, but requested him either to accept, in writing, the machinery and make payment therefor or cease operating it and return it to the company, whereupon Street discontinued all use of the machinery and returned it to the company at Amarillo, when and where the company accepted it.

"Defendant Street, by cross-action, sought to recover against the company large damages—alleged lost profits because of the failure of the engine to operate as represented. Defendant Street further answered that if he 'be mistaken as to the legal effect of the facts hereinbefore alleged,' and if it should be true that the notes, guaranties and contracts aforesaid were delivered to the company under such conditions as to become binding upon the defendants, then he pleaded a total failure of consideration of the notes because of the failure of the engine to develop the rated horse power and the capacity which the company had represented it would do, and again averred that after the tests aforesaid he, at the instance and request of the company, returned the machinery to the company, which accepted it, and further he alleged that at the time he signed the notes and agreements in connection with the threshing machinery he also signed a written order therefor on the company's forms, but same did not speak the truth, and was not intended by either party thereto to be a binding obligation, but it was agreed that same was merely a formal matter for the accommodation of the company in keeping its records, and that on the 15th of January, 1915, by mutual agreement, all the contracts were rescinded and the machinery returned to the company, which accepted same in satisfaction of all obligations evidenced by the notes and guaranty contracts.

"Plaintiff in error, plaintiff below, answered by supplemental petition, which, after certain special exceptions not necessary to be further noticed, contained a general denial and special matters of replication," and the failure of defendant in complying with certain provisions of the different writings held by plaintiff claimed to be binding on defendant and not complied with by defendant. That plaintiff had not accepted the return of the engine in rescission of said contract of sale of which defendant was notified," etc.

The case was submitted to a jury upon special issues; upon return of answers to same the court rendered judgment for defendant, and plaintiff appealed.

The material allegations of defendant's answer are supported by the evidence, and the findings of the jury warrant the judgment of the court.

[1] The following issue, among others, was submitted to the jury:

"Do you find at the time of the execution of the notes and mortgage in reference to the tractor engine that plaintiff made an agreement with the defendant that said notes were not to become binding until the plaintiff company should demonstrate to the satisfaction of the defendant that the engine was capable of producing 20 horse power on the drawbar and 40 horse power on the belt?"

—which issue was answered in the affirmative and also answered that the engine did not possess said power, which is supported by the evidence. The counter proposition of appellee applies, which is:

"Where notes are delivered in the amount of the proposed purchase price of a chattel, but on the condition that same shall not become effective until the prospective seller demonstrates that the chattel has certain qualities or capacities and same is accepted in writing by the prospective buyer, there is no sale and no liability is incurred on such notes until such demonstration is made and such acceptance obtained."

Street never accepted the engine but notified plaintiff that he would not do so, unless plaintiff would make it do the work; hence

the notes and mortgage never became effective and binding. In the case of Street v. Threshing Machine Co., 188 S. W. 725, tried in Potter county, Street sued to cancel the notes and mortgages involved in this suit, the lower court excluding parol evidence showing the verbal contract in regard to said notes, and on appeal the appellate court at Amarillo reversed the case and held:

"We gather from the pleadings and the evidence offered it was the contention that the purchase and sale of the engine was not consummated, and should not be until after trial, and if as represented Street should accept the engine in writing; and the orders and notes were left with appellee upon that condition. The order therefore did not become a binding contract between the parties until the engine was so accepted, and the notes were not obligations binding upon appellants. If the allegations of appellants are true, the contract of sale, as evidenced by the order and notes, never went into effect, and therefore was not the contract of the parties. This being true, the evidence on that issue should not have been excluded, as it would not be in its nature a contradiction of the written order and notes. It was simply offered to show that the order and notes were not executed under such circumstances as to become a binding contract. Wigmore on Evidence, §§ 2408, 2410; Watson v. Rice, 166 S. W. 106; Parker v. Naylor, 151 S. W. 1096; National Novelty Import Company v. Duncan, 182 S. W. 888."

[2] The evidence in this case shows that Street never accepted the engine in writing, but informed plaintiff that he would not do so, as the engine had failed to comply with the warranty. Plaintiff insisted on defendant keeping and using the engine, promising to make it comply with the guaranty until May 23, 1914, whereupon plaintiff sold defendant a separator on the condition that plaintiff would make the engine develop the full capacity stated. Street procured contracts from various parties to thresh at the insistence of plaintiff, until the fall of 1914, when plaintiff's collector approached him for pay on the engine, and the collector testified:

"I told him I was going to send out and get it (machinery), and he said he would bring it in, the threshing machine, turn it over, in other words, make a settlement. * * * I told him we wanted our money or would have to have the machinery."

Street testified, in substance, that he carried and delivered to plaintiff said engine and separator, which was accepted by plaintiff under said agreement, and was in settlement. This was the only reference in evidence relating to Street's return of the machinery, and in answer to the following questions submitted:

"Was the machinery in controversy returned to the plaintiff company by defendant Street under any agreement between them authorizing its return?" and "Did the plaintiff company accept the machinery in controversy under an agreement authorizing its return?"

—the jury answered yes to both questions.

As there was no other reference in the evidence to a return by defendant of the machinery, we feel compelled to hold, especially in view of the jury's finding that the machinery was returned by Street and accepted by plaintiff as a settlement of the whole transaction, that the machinery was returned by Street. As a rescission was not specifically mentioned in the questions submitted by the court, and as the mortgage authorized a return of the machinery for the purpose of a foreclosure, plaintiff contends that it should be presumed that the plaintiff received it in compliance with that provision of the mortgage. As defendant set up a rescission by the return of the machinery, and as the evidence only related thereto, we are of the opinion that the questions related to a rescission and the jury so understood. If it should be held that such an issue should have been specifically presented, and as it was not presented, we will presume that the court so found, as the evidence authorized such a finding.

Plaintiff complains of some alleged conflicts in the jury's findings. When the whole evidence is duly considered we do not see any real conflict in the findings, but think any apparent conflict can be harmonized when all things are considered; and, when we consider that no binding contract was made between the parties; that plaintiff was striving from the first to make the engine develop full power; that in order to sell the separator plaintiff agreed to make the engine comply with the warranty; that it never demanded the return of the engine until it had determined it could not remedy its defects; and that the machinery was returned and accepted—therefore we conclude plaintiff is bound by said rescission, and everything is settled as to said transaction with Street.

[3] The rule on rescission is

"To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning; that is, not, merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had never been made. Rescission necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it." Black on Rescission and Cancellation, vol. 1, § 1.

The judgment is affirmed.