**LINGO v. WOLFE (COGSWELL, Administrator of Rent Control, Intervener).**

No. 171.

Municipal Court of Appeals for the District of Columbia.

May 5, 1944.

Henry R. Berger, of Washington, D. C. (Samuel L. Mensh, of Washington, D. C., on the brief), for appellant.

Leon L. Sclawy, of Washington, D. C., for appellee.

Ernest F. Henry, of Washington, D. C. (James A. Crooks, of Washington, D. C., on the brief), for intervenor.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

CAYTON, Associate Judge.

Appeal by plaintiff from an adverse judgment in a landlord and tenant action involving rooming-house property.

A former owner had leased the property to one Davis, who with the owner's consent had assigned the lease to defendant in October 1941. Defendant availed herself of a renewal clause in the lease, and the renewal term expired on January 31, 1943. Some three months before such expiration, plaintiff bought the property. Defendant held over after the lease expired, paid rent, and became a tenant at sufferance.[1]

The lease authorized the use of the property as a rooming-house and it has been so operated ever since. All the furniture and furnishings belong to defendant. She operates three rooming-houses in addition to this one. She has at no time personally lived in this house but has placed in charge a housekeeper or resident "manager" as required by D. C. Commissioners' Order 301,000/12 of July 16, 1943. All or most of the roomers are employed in the prosecution of the war effort.

In his complaint for possession, plaintiff charged that defendant was operating the premises "for business purposes." Proceeding on the theory that the property was not within the protective purview of the Emergency Rent Act,[2] he did not say and does not say now that he requires the property "for his immediate and personal use and occupancy as a dwelling", which is one of the exempted situations an owner must establish under the Rent Act in order to oust a tenant or tenants in possession.[3] On the contrary, he candidly says he proposes to step into the shoes of defendant and continue the operation of the premises as a rooming-house. As to the roomers

[1] Code 1940, § 45—820.
[2] Code 1940, § 45—1601 et seq.
[3] Code 1940, § 45—1605 (b).

in possession he says that "he will, insofar as practicable permit such persons to continue to live in said premises."

In these circumstances, we think the trial judge correctly refused to oust the defendant and disturb the possession of her roomers.

■ In no view of the Rent Act can this be regarded as other than housing accommodations. The rentals payable by the roomers to defendant are subject to the regulatory power of the Rent Administrator. So are the various services to which the roomers are entitled. The operation of a rooming house is subject to the licensing power of the Administrator, and the Rent Act provides an over-all control of every rooming-house in the District. Its provisions supersede the older Code enactments wherever there is conflict between them. Myers v. H. L. Rust Co., 77 U.S.App.D.C. 218, 134 F.2d 417.

■ That Congress intended to include within the protection of the Act the more than ninety thousand roomers in the more than nine thousand rooming-houses in this city can hardly be doubted. Its statement of the purposes of the Act; its repeated use of the words "housing accommodations"; its express provision that such term shall include rooming-house accommodations and personal as well as real property; its equally precise provision that the term tenant shall include subtenant, lessee, sublessee, or other person entitled to the use or occupancy of *any* housing accommodations,[4] as well as the general context and spirit of the Act, all impose on us the clear duty to rule that the property as used and operated constitutes housing accommodations.

To be sure, defendant is operating the establishment as a business, and looks to it to yield her a profit. But that is not the controlling test. That fact alone does not justify the courts in lifting the property out of the realm of housing accommodations, where the law has placed it, and into the unprotected field not covered by the Act.

Nor is that legal status altered by the fact that defendant does not personally live in the house. The protection of the tenants in possession is our first and last concern, for it was to them that Congress extended the protection of the Act. Viewed in the light of their rights, the contest between this plaintiff and this defendant becomes somewhat incidental and secondary. One is striving to hold on to a profitable enterprise and the other to wrest it from her. One is in present and immediate privity with the roomers in possession and rendering the services demanded by the Act. The other has no privity with them[5] and owes them no present duty. The only comfort he holds out to them is that if he succeeds in this litigation "he will, insofar as practicable permit such persons to continue to live in said premises." The negative nature of this concession would alone be sufficient to give us pause. But even assuming that plaintiff wished to retain every present tenant, we apprehend that the transfer of management and of tenancies could not be accomplished without great difficulty. A judgment against defendant would require her to remove all her furniture, furnishings, bedding, linen, etc., from the house. This would leave for the roomers the bleak prospect of bare floors and walls until such time, if at all, as the plaintiff as new operator of the house could or would provide the furnishings to re-establish it as a rooming-house. The worst they could expect would be immediate eviction and the best would be confusion and chaos. This the law does not sanction.

Appellant cites us to three New York cases[6] based upon a rent control act adopted by that State in 1920. These we have examined and find of no applicability here because it is plain that the New York act was not intended to cover rooming-house property.

Nor is our decision in conflict with any former rulings of this court. In Gould v. Butler, D.C.Mun.App., 31 A.2d 867, we held that no privity of contract or estate existed between the owner and his tenant's roomers and that their rights were subordinate to the right of an owner who established *that he required the premises in good faith for immediate and personal occupancy by himself and family.* In Hall v. Henry J. Robb, Inc., D.C.Mun.App., 32

---

4 Code 1940, § 45—1611(f).
5 Gould v. Butler, infra.
6 May et al. v. Dermont, 114 Misc. 106, 186 N.Y.S. 113; Jackson v. Grey, 197 App.Div. 656, 189 N.Y.S. 290, and Howie v. McKenzie, 116 Misc. 117, 189 N.Y.S. 291.

A.2d 707, we affirmed a judgment for possession where the plaintiff established that there had been a *violation of a covenant against subletting* (citing Shipley v. American Security & Trust Co., 54 App.D.C. 264, 296 F. 1011). In Westchester Apartments v. Keroes, D.C.Mun.App., 32 A.2d 869, we denied possession to the landlord where it was shown that a series of sublettings were with the landlord's consent and that the notice to quit was premature. On a second appeal between the same parties, Keroes v. Westchester Apartments, D.C.Mun.App., 36 A.2d 263, we affirmed a judgment ordering an ouster of the tenant because it had then been established that she was *violating an obligation of her tenancy*.[7]

Here there is not even a suggestion that defendant is "violating an obligation of her tenancy" or that the owner "seeks in good faith to recover possession of the property for his immediate and personal use and occupancy as a dwelling."

In ordinary times, as we pointed out in the first Westchester Apartments v. Keroes case, 32 A.2d 869, the owner would have had the right to serve a notice to quit and recover possession without giving any reason, because this is a tenancy at sufferance. But these are not ordinary times. We are now governed by a highly comprehensive emergency law which suspends the remedies formerly provided by our statutes. Myers v. H. L. Rust Co., supra. Moreover, the new law had been on the books for almost a year when plaintiff bought the property. Presumably he made the purchase with full knowledge of the new barriers and controls he must face. He, like many other owners, may suffer disappointment at being unable to possess and operate his own property. He may suffer also the loss of some revenue. In that respect it may be said that he has become a financial casualty of the war. As to that we point to the reasoning of the Supreme Court in Bowles v. Willingham, 64 S.Ct. 641, 88 L.Ed. ——, decided March 27, 1944, and we hold that at a time when the Nation can demand the lives of its men and women in the waging of war, the courts should not be overly impressed with the claim of a landlord who demands possession of his property for no reason except that such posssession will yield him a greater profit than he now receives.[8]

Affirmed.

---

[7] Code 1940, § 45—1605(b) (1).

[8] See also Bowles v. American Stores, App.D.C., 139 F.2d 377, 379, certiorari denied 64 S.Ct. 947, which held, in a treble-damage price control case, that "occasional hardship * * * is not too high a price to pay for the protection of the whole community against inflation."